# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF MICHIGAN

# SOUTHERN DIVISION

| | |
|---|---|
| JESSICA WARD, individually, and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br> v.<br><br>CONSUMERS CREDIT UNION, and DOES 1 through 5, inclusive,<br><br>   Defendants. | Case No. **1:20-cv-1236**<br><br>**CLASS ACTION - COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## <u>CLASS ACTION COMPLAINT</u>

## I      INTRODUCTION

1.     Jessica Ward ("Plaintiff") brings this lawsuit against Consumers Credit Union ("Consumers" or "Defendant") on behalf of Consumers' members, on the basis that Consumers has violated and continues to violate Federal Reserve Regulation E, 12 C.F.R. § 1005.1, *et seq*. ("Reg E" or "Regulation E"). Regulation E requires that before financial institutions may charge overdraft fees on one-time debit card and ATM transactions, they must provide a complete, accurate, clear, and easily understandable disclosure document of their overdraft services (opt-in disclosure agreement); they must provide that disclosure as a stand-alone document not intertwined with other disclosures; and they must obtain verifiable agreement (affirmative consent) of a member's agreement to opt-in to the financial institution's overdraft program.

2.     Specifically, in order to comply with the Regulation E requirements, Consumers must provide members with a Regulation E opt-in disclosure agreement describing its overdraft services.  On information and belief, Consumers does not provide members, including Plaintiff, with a Regulation E opt-in disclosure agreement containing accurate language describing the circumstances in which Consumers will charge the member an overdraft fee.  Specifically, it does not use an opt-in disclosure agreement that accurately and in an easily understandable manner describes Consumers' overdraft services including, but not limited to, failing to state or clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.

3.     Because Regulation E does not permit credit unions to charge overdraft fees without affirmative consent based on a proper and accurate disclosure of its overdraft practices in a stand-alone opt-in disclosure agreement, Consumers' assessment of all overdraft fees against members for one-time debit card and ATM transactions has been and continues to be illegal. Further, Consumers' continued use of an improper, non-conforming disclosure agreement to "opt-in" new members to its overdraft service is illegal under Regulation E.

4.     Regulation E itself provides a cause of action for failing to abide by its disclosure requirements.  Plaintiff thus seeks statutory damages and the return of improperly charged

overdraft fees within the statute of limitations period.  Plaintiff also seeks to enjoin Defendant from continuing to obtain new members' "consent" to assess overdraft fees by using an opt-in disclosure agreement that violates Regulation E, and from continuing to assess any further overdraft fees on Regulation E transactions until it obtains the consent of current members using a Regulation E-conforming opt-in disclosure agreement.

## II     NATURE OF THE ACTION

5.     All allegations herein are based upon information and belief except those allegations pertaining to Plaintiff or counsel (unless otherwise stated).  Allegations pertaining to Plaintiff or counsel are based upon, *inter alia*, Plaintiff's or counsel's personal knowledge, as well as Plaintiff's or counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

6.     Plaintiff has brought this class action to assert claims in her own right, as the class representative of all other persons similarly situated.  Regulation E requires Consumers to obtain informed consent, by way of a written stand-alone document that fully and accurately describes in an easily understandable way its overdraft services, before charging members an overdraft fee on one-time debit card and ATM transactions.  Because of the substantial harm to members of significant overdraft fees on relatively small debit card and ATM transactions, Regulation E requires financial institutions to put all pertinent overdraft information in one clear and easily understood document.  Financial institutions are not permitted to circumvent this requirement by referencing, or relying on, their account agreements, disclosures, or marketing materials. Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies.

7.     Consumers does not meet this requirement.  On information and belief, Consumers does not use a compliant opt-in disclosure agreement because, *inter alia*, it fails to accurately and in an easily understandable manner describe Consumers' overdraft services

2

including, but not limited to, failing to state or clearly describe that an overdraft occurs when the "available balance" is below zero.

8.      Consumers calculates account balances for overdraft purposes using an artificially reduced calculation created by Consumers' own internal bookkeeping called the "available balance," which deducts any money it unilaterally decides should be held for future transactions. When these future holds are accounted for, the calculation can result in a negative "available balance" existing only on paper, even though there is actually money in the account to cover a transaction without a negative account balance at the time of payment and posting.  While that practice is unfair on its face, the disclosure of the practice is at issue, not the practice itself.

9.      Consumers' use of the artificially reduced account balance to assess overdraft fees is material.  Based on analysis with other financial institutions, it is likely Consumers assessed overdraft fees on 10-20% more Regulation E overdraft transactions than would otherwise be the case if it used the actual balance to determine if an account was overdrawn.

10.     Plaintiff has been harmed by Consumers' Regulation E violation.  On information and belief, she was opted-in to Consumers' overdraft program using an improper disclosure agreement that inaccurately described Consumers' overdraft practices, and has been assessed overdraft fees on Reg E transactions (including at least one transaction that would not have received an overdraft fee using the actual balance, but was assessed an overdraft fee using the available balance) that were not permitted because Consumers had earlier obtained Plaintiff's "consent" using a noncompliant Reg E opt-in disclosure agreement.  This action seeks statutory damages under Regulation E, restitution, and injunctive relief due to, *inter alia*, Consumers' policy and practice of obtaining "affirmative consent" using a noncompliant opt-in disclosure agreement, unlawfully assessing and unilaterally collecting overdraft fees as set forth herein.

### III      PARTIES

11.     Plaintiff Jessica Ward is a resident of Kalamazoo, Michigan, and a Consumers member at all relevant times to the allegations in this Complaint.

12.     Based on information and belief, Defendant Consumers is a credit union with its headquarters and principal place of business in Kalamazoo, Michigan. Consumers also maintain several branches throughout the State of Michigan.

13.     Without limitation, defendants DOES 1 through 5, include agents, partners, joint ventures, subsidiaries, and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations.  As used herein, where appropriate, the term "Defendant" is also inclusive of Defendants DOES 1 through 5.

14.     Plaintiff is unaware of the true names of Defendants DOES 1 through 5. Defendants DOES 1 through 5 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against Defendants DOES 1 through 5 when the true names are ascertained, or as permitted by law or the Court.

15.     There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are *alter egos* in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

16.     At all material times herein, each defendant was the agent, servant, co-conspirator, and/or employer of each of the remaining defendants; acted within the purpose, scope, and course of said agency, service, conspiracy, and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants; and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

17.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was

actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

18.     As to the conduct alleged herein, each act was authorized, ratified, or directed by Defendant's officers, directors, or managing agents.

### IV     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, 15 U.S.C. § 1693m, and 28 U.S.C. § 1367(a).

20.     Venue is proper in this District because Consumers maintains its headquarters in this District, transacts business in this District, Plaintiff and similarly situated persons entered contracts with Consumers in this District, and Consumers executed the unlawful policies and practices which are the subject of this action in this District.

### V     BACKGROUND

**A.     Defendant Consumers**

21.     Consumers is a credit union headquartered in Kalamazoo, Michigan with approximately 20 branches throughout the state of Michigan.  As of September 2020, Consumers reported that it has just over 100,000 members and nearly 300 full time employees.  Consumers further reports that it holds approximately $1.4 billion in assets on behalf of its members. In 2019 alone, Consumers collected approximately $15 million in fee income, of which overdraft fees are believed to be a significant percentage.

22.     One of the main services Defendant offers is a share draft account (*i.e.,* a checking account).  A checking account balance can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at a branch; and deposits at ATM machines.  Debits decreasing the amount in a checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases.  Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH)

transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.

23.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) and non-sufficient funds ("NSF") fees (a fee for a declined, unpaid returned item) to accounts when it claims to have determined that an account has been overdrawn.

24.     The underlying principle for charging overdraft fees is that when a financial institution pays a transaction by advancing its own funds to cover the accountholder's insufficient funds, it may charge a *contracted and/or disclosed* fee, provided that charging the fee is not prohibited by some legal regulation.  The fee Defendant charges here constitutes very expensive credit that harms the poorest customers and creates substantial profit.  According to a 2014 Consumer Financial Protection Bureau ("CFPB") study:[1]

- Overdraft and NSF fees constitute the majority of the total checking account fees that customers incur.

- The transactions leading to overdrafts are often quite small.  In the case of debit card transactions, the median amount of the transaction that leads to an overdraft fee is $24.

- The average overdraft fee for bigger banks is $34 and $31 for smaller banks and credit unions.

Accordingly, as highlighted in the CFPB Press Release related to this study:

> Put in lending terms, if a consumer borrowed $24 for three days and paid the median overdraft of $34, **such a loan would carry a 17,000 percent annual percentage rate (APR).**

(Emphasis added)[2]

---

[1] https://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf (last visited Nov. 10, 2020).

[2] CFPB, CFPB Finds Small Debit Purchases Lead to Expensive Overdraft Charges (7/31/2014) https://www.consumerfinance.gov/about-us/newsroom/cfpb-finds-small-debit-purchases-lead-to-expensive-overdraft-charges/ (last visited Nov. 10, 2020).

25.     Overdraft and NSF fees constitute a primary revenue generator for banks and credit unions.  According to one banking industry market research company, Moebs Services, banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.[3]

26.     Defendant's financial filings and practices reveal that it has followed these trends to the letter.  Defendant charges an overdraft/NSF fee of $35.00 per item.  Even if Defendant had been properly charging overdraft fees, the $35.00 overdraft fee bears no relation to the financial institution's minute risk of loss or cost for administering overdraft services.  But the fee's practical effect is to charge those who pay it an interest rate with an APR in the thousands.

27.     Accordingly, the overdraft fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.  A 2012 study found that more than 90% of customers who were assessed overdraft fees overdrew their accounts by mistake.[4]  In a 2014 study, more than 60% of the transactions that resulted in a large overdraft fee were for less than $50.[5]  More than 50% of those customers assessed overdraft fees do not recall opting into an overdraft program, (*id*. at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than being charged a very large fee. (*Id*. at p. 10.)

28.     Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb the overdraft fees.  Younger, lower-income, and non-white accountholders are among those most likely to be assessed overdraft fees.  *Id*. at p. 3.  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*.

---

[3] Moebs Services, *Overdraft Revenue Inches Up in 2018* (March 27, 2019), http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%20 2018%200032719-1.pdf?ver=2019-03-27-115625-283 (last visited Nov. 10, 2020).

[4] Pew Charitable Trust Report, *Overdraft America: Confusion and Concerns about Bank Practices*, at p. 4 (May 2012), https://www.pewtrusts.org/- /media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america1pdf.pdf (last visited Nov. 10, 2020).

[5] Pew Charitable Trust Report, *Overdrawn*, at p. 8 (June 2014), https://www.pewtrusts.org/-/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf (last visited Nov. 10, 2020).

More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p.

4.  And non-whites are 83% more likely to pay an overdraft fee than whites.  *Id*. at p. 3.

**B.     Plaintiff**

29.     Plaintiff Jessica Ward is a resident of the state of Michigan and a member of

Consumers.  Plaintiff has held an account with Consumers at all times relevant to the allegations

and is opted into its overdraft program for her debit card and ATM transactions.  As will be

established using Consumers' own records, Plaintiff has been assessed numerous improper fees

on her debit card and ATM transactions.  By way of example, on November 16, 2020, Plaintiff

was assessed a $35 overdraft fee on a $50 non-recurring debit card transaction even though

Plaintiff had a positive account balance and had money in the account ($419.54) to pay the

transaction.  Based on information and belief, Defendant was not required to advance any of its

own funds to cover the transaction, and Plaintiff was only assessed an overdraft fee because of

Consumers' use of the available balance instead of the actual balance to determine if the account

was overdrawn.  The extent of improper charges assessed on Plaintiff and other members will be

determined in discovery using Defendant's records.

**C.     Regulation E**

30.     For many years, banks and credit unions have offered overdraft services to their

accountholders.  Historically, the fees generated by these services were relatively low,

particularly when methods of payment were limited to cash, check, and credit card.  But the rise

of debit card transactions replacing cash for smaller transactions—especially for younger

customers who carried lower balances—provided an opportunity for financial institutions to

increase the number of transactions in a checking account that could potentially be considered

overdraft transactions, and for which the financial institution could assess a hefty overdraft fee.

The increase in these types of transactions was timed perfectly for financial institutions, which

faced falling revenue as a result of lower overall interest rates and the rise of competitive

innovations such as no-fee checking accounts.  Financial institutions thus recognized in overdraft

fees a new and increasing revenue stream.

8

31.     As a result, the overdraft process became one of the primary sources of revenue for financial depository institutions—banks and credit unions—both large and small.  As such, financial institutions became eager to provide overdraft services to consumers because not only do overdrafts generate revenue, they do so with little risk.  When an overdraft is covered, it is on average repaid in three days, meaning that the financial institution advances small sums of money for no more than a day or two.

32.     Using common understanding, an overdraft occurs when two conditions are satisfied.  First, the member initiates a transaction that will result in the money in the account falling below zero if the financial institution makes payment on the transaction.  Second, the financial institution pays the transaction by advancing its own funds to cover the shortfall.  An overdraft, therefore, is an extension of credit. The financial institution advancing the funds, allows the accountholder to continue paying transactions even when the account has no money in it, or the account has insufficient funds to cover the amount of the withdrawal.[6]  The financial institution uses its own money to pay the transaction, on the assumption that the accountholder will eventually cover the shortfall.

33.     Before the Federal Reserve adopted Regulation E, many financial institutions unilaterally adopted internal "overdraft payment" plans.  Customers would initiate transactions that financial institutions would identify as "overdrafts," then the financial institution would go ahead and cover the overdraft while charging the standard overdraft fee.  Under such programs, consumers were charged a substantial fee—on average higher than the debit card transaction triggering the overdraft itself—without ever having made any choice as to whether they wanted such transactions approved or instead declined and providing the opportunity to select another form of payment rather than turning the $4 cup of coffee at Starbucks into a $40 cup of coffee.

34.     The Federal Reserve, which has regulatory oversight over financial institutions, recognized that banks and credit unions had strong incentives to adopt these punitive overdraft

---

[6] For a thorough description of the mechanics of an "overdraft," see https://www.investopedia.com/terms/o/overdraft.osp (last visited Nov. 10, 2020).

programs.  Banks and credit unions could rely on charging high fees for very little service and almost no risk on thousands of transactions per day, giving consumers no choice in the matter if they wanted to have a bank account at all.  It is for these reasons that in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders for overdraft coverage on ATM and non-recurring "point of sale" debit card transactions.  After Regulation E's adoption, a financial institution could only lawfully charge an overdraft fee on one-time debit card purchases and ATM withdrawals if the consumer opted into the financial institution's overdraft program. Otherwise, the bank or credit union could either cover the overdraft without charging a fee or, simply direct the transaction to be denied at the point of sale.  Further, without the opt-in, there could be no NSF fee incurred because the denial of the transaction meant no transaction had taken place, and thus no transaction to return unpaid.

35.     With the creation of the CFPB, it subsequently undertook the study referenced above regarding financial institutions' overdraft programs and whether they were satisfying consumer needs.  Unsurprisingly, the CFPB found that overdraft programs had a series of problems.  The most pressing problem was that overdraft services were costly and damaging to accountholders.  The percentage of accounts experiencing at least one overdraft (or NSF) transaction in 2011 was 27%, and the average amount of overdraft and NSF-related fees paid by accounts that paid fees was $225.  The CFPB further estimated that the banking industry may have collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts.  The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be

charged a fee."[7]

36.     Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees.  Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies.  By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of funds (average $24) for a small period of time (average 3 days), then charge a large fee (average $34) that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest (using averages - 17,000% APR), all while assuming very little risk because only a very small percentage of the overdraft customers failed to repay the overdraft.

37.     Because of this, Regulation E does not merely require a financial institution to obtain an opt-in disclosure agreement before charging fees for transactions that result in overdrafts.  It also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid.  The agreement must be a stand-alone document, not combined with other forms, disclosures, or contracts provided by the financial institution.  It must also accurately disclose to the accountholder the institution's overdraft charge policies.  The accountholder's choices must be presented in a "clear and readily understandable manner."  12 C.F.R. § 1005.4(a)(1).  The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure agreement.

38.     In the wake of Regulation E, some financial institutions simply decided to forego charging overdraft fees on non-recurring debit card and ATM transactions.  These include large

---

[7] The Federal Reserve has previously noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management."  69 Fed. Reg. 31761 (June 7, 2004).

banks such as Bank of America, and smaller banks such as One West Bank, First Republic Bank, and Mechanics Bank.  However, most financial institutions continued to maintain overdraft services on one-time debit card and ATM withdrawals.  As such, these banks and credit unions must satisfy Regulation E's requirements in order to obtain compliant affirmative consent from their accountholders before charging overdraft fees on eligible transactions.

39.     But charging these exorbitant penalty fees for the bank or credit union's small advance of funds to cover overdrafts was not where it stopped.  Many financial institutions began manipulating the process as to when they would consider a transaction an overdraft to further increase the profit generated by their overdraft programs.  They charged overdraft fees no longer just when the financial institution actually advanced money on behalf of the customer, but assessed overdraft fees on transactions when they paid the transaction with the customers' money.  That is, the financial institution unilaterally decided the account was overdrawn not by the actual lack of funds in the account, but by whether the money in the account minus holds the financial institution unilaterally decided was for future events was enough to cover an ATM or one-time debit transaction when these transactions came in for payment at some future date.

40.     Most banks and credit unions calculate two account balances related to their accounting of a customer checking account.  "Actual balance," "ledger balance," or "current balance" are all terms used to describe the actual amount of the accountholder's money in the account at any particular time.  In contrast, "available balance" is a term the financial industry recognizes as a balance reduced from the actual account balance by the amount the bank or credit union has either held from deposits or held from the account because of authorized debit transactions that have not yet come in (and may never come in) for payment.[8]

41.     Although financial institutions calculate two balances, the actual/ledger/current balance of the money in the account is the official balance of the account.  It is used when

_____

[8] Some financial institutions use a third balance called the collected balance, which is also an internal calculated balance that is the actual account balance minus only deposit holds, and does not include debit holds.

financial institutions report deposits to regulators, when they pay interest on an account, and when they report the amount of money in the account in monthly statements to the customer—the official record of the account.

42.     While there is no regulation barring any financial institution from deciding whether it will assess overdraft or NSF fees based on the actual balance or the "available balance" for overdraft assessment purposes, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed.  Whether the financial institution uses the actual money in the account or an internal artificial available balance to assess overdraft fees, is information the customer needs to understand the overdraft program.

43.     Many financial institutions use the "available balance" for overdraft assessment purposes as it is consistent with these institutions' self-interest because the available balance is always the same or lower, by definition, than the actual balance.  The actual balance includes all money in the account.  The available balance, on the other hand, always subtracts any holds placed on the funds in the account that may affect the money in the account in the future.  It never adds funds to the account.  To be clear, even when a financial institution has put a hold on funds in an account, the funds remain in the account.  The financial institution's "hold" is merely an internal characterization the bank or credit union uses to categorize some of the money.  All of the accountholder's money remains in the account, even the money Defendant has defined as "held."  The fact that the money has a "hold" on it does not mean it has been removed from the account.

44.     The difference between which of the two balances a financial institution may use to calculate overdraft transactions is material to both the financial institution and accountholders.  Prior investigation in similar lawsuits demonstrates that financial institutions using the available balance, instead of actual balance, increase the number of transactions that are assessed overdraft fees approximately 10-20%.  What happens in those 10-20% of transactions is that sufficient funds are in the account to pay the transaction and therefore the bank or credit union has not advanced any funds to the customer.  At all times, the financial institution uses the customer's

own money to pay the transaction, which really means there has never been an overdraft at all—yet the financial institution charges an overdraft fee on the transaction anyway.

45.     A hypothetical demonstrates what the financial institution is doing under these circumstances.  Suppose that an individual has $1,000.  The individual intends to use $800 of this amount to pay rent.  The individual then intends to use the other $200 to make his monthly car payment.  But before the rent and car payment come due, the individual receives a $40 water bill which informs that the bill must be paid immediately, or water service will be cut off.  The individual now takes $40 from the money he has earmarked for his car payment to pay the water bill.  This individual has not spent more money that he has on hand—but he does need to find an additional $40 before the car payment comes due.  And if the individual does find the additional $40 before paying the car payment, there will never be a problem.  If he falls short, he may choose to proceed with the transaction anyway, for example, by writing a check for the car payment when he does not have funds to cover the bill.  He would then create a potential "overdraft" of his funds for the car payment, but not the rent payment and the water bill.

46.     The same pattern holds for financial institutions that calculate overdrafts using the actual (or ledger or current) balance of an account.  Suppose the same individual put the $1,000 in his checking account under similar circumstances on the 27th of the month.  That day, he also authorizes his $800 rent to be paid on the first of the next month, and his $200 car payment to be paid on the third of the next month.  The individual then realizes that the $40 payment on his water bill must be paid that day—the 27th of the month—or he will incur a fee.  He approves the water bill payment, and it posts immediately.  Then, a few days later, he transfers an additional $40 into the account which is enough to offset the water bill payment before the initial $800 rent and $200 car payments post and clear the account.  All three payments are made with the individual's own account funds.  The financial institution never uses its own funds as an advance, and there is no "overdraft" of the account because the balance always remains positive.  However, even if the customer does not transfer the $40, it is only the car payment which posts

14

last that is paid without sufficient money in the account to cover it.  Thus, there is only one transaction (*i.e.*, the car payment) eligible for an overdraft fee.

47.  A financial institution that uses the "available balance" method of calculating overdrafts would come to a different conclusion.  Because the available balance subtracts from the account the amount of money that the financial institution is "holding" for other pending transactions, the financial institution considers the money set aside and unavailable, even though it is still in the account.  This means that after the $800 and $200 transactions are scheduled, the "available balance" of the account is $0 even though $1,000 still remains in the account.  Under these circumstances, when the individual makes the additional $40 payment and it posts first, the "available balance" is negative and the accountholder is charged an overdraft fee—even though the original $1,000 is still in the account.  And what is worse, even if the accountholder deposits $40 in the account before the original $800 and $200 payments post and clear, he is still subject to the overdraft fee for the $40 transaction even though the financial institution never "covered" any portion of the payment with its own funds.  Finally, what is worse still, if the customer does not make a deposit to cover the overdraft, the customer will be assessed an overdraft fee for all three transactions.  Thus, using the available balance, although the financial institution only has to advance its own funds for one transaction (*i.e.,* the car payment), the financial institution will assess three overdraft fees tripling its profits from the same transactions.

48.  Financial institutions have been put on notice by regulators, banking associations, their insurance companies and risk management departments, and from observing litigation and settlements that the practice of using the available balance instead of the actual amount of money in the account (*i.e.*, the actual, ledger, or current balance) to calculate overdrafts without clear disclosure of that practice likely violates Reg E and other state laws.  For instance, the FDIC stated in 2019:

> Institutions' processing systems utilize an "available balance" method or a "ledger balance" method to assess overdraft fees. The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an

available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.[9]

The CFPB provided in its Winter 2015 Supervisory Highlights, that:

A ledger-balance method factors in only settled transactions in calculating an account's balance; an available-balance method calculates an account's balance based on electronic transactions that the institutions have authorized (and therefore are obligated to pay) but not yet settled, along with settled transactions. An available balance also reflects holds on deposits that have not yet cleared. Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive.[10]

49.     Under Regulation E, the financial institution may decide which balance it chooses to use for overdraft fees on one-time debit card and ATM transactions, but it is also very clear that it must disclose this practice accurately, clearly and in a way that is easily understood.  As the Regulation E opt-in disclosure agreement must include this information in a stand-alone document, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the financial institution from charging that customer overdraft fees on one-time debit card and ATM transactions.  Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E.

---

[9]https://www.fdic.gov/regulations/examinations/consumercomplsupervisoryhighlights.pdf (last visited Nov. 10, 2020).
[10] https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf, p. 8 (last visited Nov. 10, 2020).

**D.     Consumers' Regulation E Practices**

50.     On information and belief, Consumers opted members into its overdraft practices using an opt-in disclosure that violated Regulation E.  The opt-in disclosure agreement was inaccurate and/or unclear because, *inter alia*, it did not inform Plaintiff and putative class members that Consumers uses the "available" balance to assess overdraft fees when that is its practice.

51.     Many courts have already found that failing to clearly and accurately describe an overdraft program in the Regulation E opt-in disclosure agreement can constitute a violation of Regulation E. [11]  By using inaccurate and/or ambiguous language to describe what constitutes an overdraft, Consumers has failed to provide a clear and easily understandable description of its overdraft services in its opt-in disclosure agreement as Regulation E demands.

52.     Many financial institutions that use the available balance to calculate overdrafts have specifically addressed the practice in their opt-in disclosure agreements.  San Diego County Credit Union, for example, defines an "overdraft" as when "the available balance in your account is nonsufficient to cover a transaction at the time that the transaction posts to your account, but we pay it anyway."  Synovus Bank defines an overdraft as when there is not enough money in an account, but adds the additional caveat that it "authorize[s] and pay[s] transactions using the Available Balance in [the] account," and then specifically defines the Available Balance.  TD

---

[11] *Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237-38; 1243-45 (11th Cir. 2019); *Bettencourt v. Jeanne D'Arc Credit Union*, 370 F. Supp. 3d 258, 261-66 (D. Mass. 2019); *Pinkston-Poling v. Advia Credit Union*, 227 F. Supp. 3d 848, 855-57 (W.D. Mich. 2016); *Walbridge v. Northeast Credit Union*, 299 F. Supp. 3d 338, 343-46; 348 (D.N.H. 2018) (holding that terms such as "enough money," "insufficient funds," "nonsufficient funds," "available funds," "insufficient available funds," and "account balance" were ambiguous such that the Reg E claim was not dismissed ); *Smith v. Bank of Hawaii*, No. 16-00513 JMS-RLP, 2017 WL 3597522, at *6– 8 (D. Haw. Apr. 13, 2017) ("sporadic" use of terms such as "available" funds or balances insufficiently explained to consumer when overdraft fee could be charged and ambiguous use of terms in opt-in agreement constituted a proper allegation of a Reg E violation); *Walker v. People's United Bank*, 305 F. Supp. 3d 365, 375-76 (D. Conn. 2018) (holding that allegations were sufficient to state a cause of action for violation of Reg E where opt-in form failed to provide customers with a valid description of overdraft program);  *Ramirez v. Baxter Credit Union*, No. 16-CV-03765-SI, 2017 WL 1064991, at *4-8 (N.D. Cal. Mar. 21, 2017); *Gunter v. United Fed. Credit Union*, No. 315CV00483MMDWGC, 2016 WL 3457009, at *3-4 (D. Nev. June 22, 2016).

Bank's opt-in disclosure agreement states as follows: "An overdraft occurs when your available balance is not sufficient to cover a transaction, but we pay it anyway.  Your available balance is reduced by any 'pending' debit card transactions (purchases and ATM withdrawals) and includes any deposited funds that have been made available pursuant to our Funds Availability Policy." Similarly, Communication Federal Credit Union's opt-in disclosure agreement states, "[a]n overdraft occurs when you do not have enough money in your account to cover a transaction, or the transaction exceeds your available balance, but we pay it anyway.  'Available Balance' is your account balance less any holds placed on your account."

53.     Here, Consumers' failure to accurately, clearly, and in an easily understandable way identify that it assesses overdraft fees when the available balance falls below zero in a stand-alone opt-in disclosure agreement resulted in its failure to obtain the appropriate affirmative consent necessary to opt members into its overdraft program.  Consumers has and continues to charge members overdraft fees for non-recurring debit card and ATM transactions in violation of Regulation E.  Further, Consumers continues to "opt-in" new checking account members into its overdraft program using an improper opt-in disclosure agreement.

## VI     FACTUAL ALLEGATIONS AGAINST DEFENDANT

54.     At all relevant times, Consumers used the "available balance," and not the actual account balance to determine whether to assess overdraft fees on one-time debit card and ATM transactions.

55.     At all relevant times, Consumers knew or should have known, that in order to legally charge its members overdraft fees, it was required to first obtain affirmative consent from the member using a Regulation E compliant stand-alone opt-in disclosure agreement.  Regulation E compliance requires, at a minimum, that a financial institution accurately disclose all material parts of its overdraft program and policies in the opt-in disclosure agreement in clear and easily understood language before obtaining consent from a member to "opt in" to those programs.

56.     At all relevant times, on information and belief, Consumers used an identical opt-in disclosure agreement with Plaintiff and all putative class members.

57.     On information and belief, the opt-in disclosure agreement did not accurately and in a clear and easily understandable way describe Consumers' overdraft services including, but not limited to, failing to clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.

58.     Because Consumers uses an opt-in disclosure agreement that does not accurately and clearly describe its overdraft practices and thus is not compliant with Regulation E, Consumers is not permitted to charge members overdraft fees on one-time debit card and ATM transactions.

59.     At all relevant times, Consumers knew it was using the available balance to assess overdraft fees, and further knew or should have known that this practice had to be clearly and accurately described in a stand-alone document.  Consumers also knew or should have known that its opt-in disclosure agreement was not providing an accurate, clear and easily understandable definition of an overdraft.

60.     At all relevant times, Consumers charged Plaintiff and the putative class overdraft fees on one-time debit card and ATM transactions even though it had not complied with Regulation E to first obtain members' affirmative consent using a Regulation E compliant opt-in disclosure agreement before it charged these fees.

61.     Based on information and belief, Consumers continues to "opt-in" members in its overdraft program using a non-compliant opt-in disclosure agreement, and then charges those members overdraft fees on one-time debit card and ATM transactions.

62.     Based on information and belief, Consumers continues to charge existing members overdraft fees on one-time debit card and ATM transactions who had "opted-in" using that same non-compliant opt-in disclosure agreement.

## VII     CLASS ACTION ALLEGATIONS

63.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

64.     Plaintiff brings this case, and each of the respective causes of action, as a class action.

65.     The "Class" is composed of one of the following:

**The Regulation E Class**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning one-year preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

**The Equitable Claims Class**:

> All members of Defendant who have or have had accounts with Defendant who were assessed an overdraft fee on a one-time debit card or ATM transaction beginning six years preceding the filing of this complaint and ending on the date the Class is certified. Following discovery, this definition will be amended as appropriate.

66.     Excluded from the Classes are: 1) any entity in which Defendant has a controlling interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to work on the case; and 4) all employees of the law firms representing Plaintiff and the Class Members.

67.     This action has been brought and may be properly maintained on behalf of each member of the Class pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

68.     **Numerosity** – The members of the Class ("Class Members") are so numerous that joinder of all Class Members would be impracticable.  While the exact number of Class Members is presently unknown to Plaintiff, and can only be determined through appropriate discovery, Plaintiff believes based on the percentage of customers that are harmed by these practices with banks and credit unions with similar practices, that the Class is likely to include thousands of members.

69.     Upon information and belief, Defendant has databases, and/or other documentation, of its members' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's members has been

harmed by its practices and thus qualify as a Class Member.  Further, the Class definitions identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

70.     **Commonality** – This action involves common questions of law and fact.  The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- Whether Defendant used the available balance for making a determination of whether to assess overdraft fees on one-time debit card and ATM transactions;

- Whether the opt-in disclosure agreement Defendant used to opt-in Class Members violated the mandate of Regulation E that the opt-in disclosure agreement be a stand-alone document that must accurately, clearly, and in an easily understandable way describe the overdraft services of Defendant;

- Whether Defendant breached Regulation E when it assessed overdraft fees on one-time debit card and ATM transactions against Class Members;

- Whether Defendant's conduct makes it liable under claims for unjust enrichment and money had a received; and

- Whether Defendant continues to violate Regulation E and unjustly enrich itself by opting in members using an opt-in disclosure agreement that violates Regulation E and continuing to assess members overdraft fees on one-time debit card and ATM transactions based on an opt-in disclosure agreement that violates Regulation E.

71.     **Typicality** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members are substantially the same because the opt-in disclosure

agreement used to opt-in Plaintiff is the same as the opt-in disclosure agreement used by Defendant to opt-in the Class Members.  Further, Plaintiff and the Class Members have each been assessed overdraft fees on one-time debit card and ATM transactions.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class Members.

72.     **<u>Adequacy</u>** – Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in class action litigation, and specifically financial institution overdraft class action cases to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and counsel intend to prosecute this action vigorously.

73.     **<u>Predominance and Superiority</u>** – The matter is properly maintained as a class action because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter.  Because the injuries suffered by the individual Class Members are relatively small compared to the cost of the litigation, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court.  In contrast, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law.  Plaintiff knows of no difficulty that will be encountered in the

management of this litigation that would preclude its maintenance as a class action.  As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

74.     Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class Members and that she will adequately represent the Class. This particular forum is desirable for this litigation because Plaintiff's claims arise from activities that occurred largely therein.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

75.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

76.     This matter is properly maintained as a class action pursuant to Fed. R. Civ. P. 23 in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or
- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the difficulties likely to be encountered in the management of a class action.

77.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole under Federal Rule of Civil Procedure 23(b)(2).  Moreover, on information and belief, Plaintiff alleges that Defendant's use of a non-compliant Regulation E opt-in disclosure agreement is substantially likely to continue in the future if an injunction is not entered.

## FIRST CAUSE OF ACTION

### (Violation of Regulation E)

78.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

79.    By charging overdraft fees on ATM and non-recurring debit card transactions, Defendant violated Regulation E, 12 C.F.R. §§ 1005, *et seq*., whose "primary objective" is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., the 'EFTA,'" 12 C.F.R. § 1005.1(b)).

80.    Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E.  12 C.F.R. § 1005.17.  The Opt In Rule states:  "a financial institution . . . *shall not assess a fee or charge* . . . pursuant to the institution's overdraft service, *unless* the institution:

(i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . *describing the institution's overdraft service*" and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program.  *Id*. (emphasis added).  The notice "shall be clear and readily understandable."  12 C.F.R. § 1005.4(a)(1).  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.  Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

81.     The intent and purpose of this opt-in disclosure agreement is to "assist customers in understanding <u>how</u> overdraft services provided by their institutions <u>operate</u> . . . by <u>explaining</u> the institution's overdraft service . . . in a <u>clear and readily understandable way</u>"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948, which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E.  *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z).

82.     Defendant failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution may assess overdraft fees against members' accounts through an overdraft program for ATM withdrawals and non-recurring debit card transactions.  Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its members with a stand-alone disclosure agreement that in a "clear and readily understandable way" describes the overdraft program, meeting the strictures of 12 C.F.R. § 1005.17.  Specifically, on information and belief, the opt-in disclosure

agreement does not accurately and in a easily understandable manner describe Consumers' overdraft services including, but not limited to, failing to clearly describe that an overdraft occurs when the "available balance" is below zero when that is its practice.

83.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining valid affirmative consent to do so, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions, and it has harmed Plaintiff and the Class Members by assessing overdraft fees on one-time debit card and ATM transactions.

84.     As the result of Defendant's violations of Regulation E, 12 C.F.R. § 1005, *et seq.*, Plaintiff and members of the Class are entitled to statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

85.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

86.     As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft fees.

87.     Because Plaintiff and the Class Members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and Class Members seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Money Had and Received)

88.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

90.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## VIII    PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a.     for an order certifying this action as a class action;

b.     for an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

c.     for statutory damages;

d.     for civil penalties;

e.     for an order enjoining the continued wrongful conduct alleged herein;

f.     for costs;

g.     for pre-judgment and post-judgment interest as provided by law;

h.     for attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

i.     for such other relief as the Court deems just and proper.


Dated: December 22, 2020                    Respectfully Submitted,

*/s/ Richard D. McCune*
Richard D. McCune (CA State Bar No. 132124)*
rdm@mccunewright.com
David C. Wright (CA State Bar No. 177468)**
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Philip J. Goodman, Of Counsel (P14168)
PJGoodman1@aol.com
Eric B. Abramson (P60949)
eabramsonesq@gmail.com
**SERLING AND ABRAMSON, P.C.**
280 N. Old Woodward Ave.. Suite 407
Birmingham, MI 48009
Telephone: (248) 647-6966

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116

*Attorneys for Plaintiff Jessica Ward*
*and the Putative Class*

## DEMAND FOR JURY TRIAL

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

*/s/ Richard D. McCune*
Richard D. McCune (CA State Bar No. 132124)*
rdm@mccunewright.com
David C. Wright (CA State Bar No. 177468)**
dcw@mccunewright.com
**MCCUNE WRIGHT AREVALO, LLP**
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557 1275

Philip J. Goodman, Of Counsel (P14168)
PJGoodman1@aol.com
Eric B. Abramson (P60949)
eabramsonesq@gmail.com
**SERLING AND ABRAMSON, P.C.**
280 N. Old Woodward Ave.. Suite 407
Birmingham, MI 48009
Telephone: (248) 647-6966

Emily J. Kirk (IL Bar No. 6275282)*
ejk@mccunewright.com
**McCUNE WRIGHT AREVALO, LLP**
231 N. Main Street, Suite 20
Edwardsville, IL 62025
Telephone: (618) 307-6116

*Attorneys for Plaintiff Jessica Ward*
*and the Putative Class*

*Admitted to Practice
**Petition for Admission to be submitted